# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to | No. 79561-9-I |
| U.D.W.,<br>D.O.B. 09/15/2015 | DIVISION ONE |
| STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES, | UNPUBLISHED OPINION |
| Respondent, | |
| v. | |
| FELTON MARSHALL WARNER, | |
| Appellant. | FILED: November 18, 2019 |

APPELWICK, C.J. — On remand from this court, the trial court reconsidered whether termination of Warner's parental rights was appropriate based on the parental deficiencies of which he had notice. The court again found that it was in U.D.W.'s best interests that Warner's parental rights be terminated. It based this finding in part on Warner's inability to provide for U.D.W.'s basic needs or the additional care he requires. Warner argues that he did not receive adequate notice that his inability to meet U.D.W.'s special needs was a parental deficiency that would be considered as a basis for terminating his parental rights. We affirm.

FACTS

U.D.W. was born on September 15, 2015. His father is Felton Warner, and his mother is Takiria Raton. When U.D.W. was an infant, Child Protective Services (CPS) became involved with the family after receiving a report about an alleged domestic violence incident. In re Dependency of U.D.W., No. 77991-5-I, slip. op. at 1 (Wash Ct. App. Nov. 13, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/779915.pdf. CPS uncovered concerns about Warner and Raton's drug use, safety issues, and prior violence. Id. at 1-2. In early January 2016, a fight broke out among Warner's family members at the home of Raton's mother. Id. at 2. U.D.W. was present in the home at the time. Id. Warner was arrested. Id. He later pleaded guilty to domestic violence assault of his mother. Id.

On January 12, 2016, the Department of Social and Health Services (Department) filed a dependency petition.[1] U.D.W. was removed from Warner and Raton's care that same day. He has not lived with either parent since that time.[2] Id.

In April 2016, a dependency was established as to Warner. In the order of dependency, Warner agreed that U.D.W. was dependent under RCW 13.34.030 for two reasons: (1) because he was unavailable to parent due to his incarceration, and (2) because he needed to resume drug and alcohol treatment. The trial court

---

[1] On July 1, 2018, all powers, duties, and functions of the Department of Social and Health Services pertaining to child welfare services were transferred to the Department of Children, Youth, and Families. RCW 43.216.906(1).

[2] The trial court terminated Raton's parental rights on December 6, 2017. She is not a party to this appeal.

ordered Warner to engage in drug and alcohol treatment, random urinalysis testing, parenting classes, and a domestic violence assessment.

In June 2016, Warner moved the trial court to place U.D.W. with his stepmother. The trial court denied the motion, partly due to medical documentation from U.D.W.'s doctor that he should not be moved to a different placement. U.D.W. has breathing issues, and it was recommended that he not be around anyone that had been smoking, or has the smell of smoke on their clothing. Before a visit with U.D.W. in July 2016, Lisa Lopez, a social service specialist with the Department, spoke with Warner. She reiterated the importance of not smoking or being around people that are smoking before seeing U.D.W.

In the year after the dependency was established, Warner participated in a drug evaluation, intermittent drug treatment, and urinalysis testing. U.D.W., No. 77991-5-I, slip. op. at 2. However, he failed to complete a drug and alcohol treatment program, did not consistently participate in urinalysis testing, and did not remain consistently drug free. Id. Warner twice enrolled in parenting classes, but was unable to complete either session. Id. at 2-3. He was unable to maintain stable housing. Id. at 3. And, he never completed a domestic violence assessment. Id. Warner's frequent short-term periods of incarceration impeded his ability to complete court-ordered services. Id.

Through visitation, Warner maintained a generally positive relationship with U.D.W. Id. But, during the dependency, he was unable to regularly and consistently visit U.D.W. due to his frequent arrests and periods of incarceration. Id.

3

In April 2017, the Department filed a petition to terminate Warner's parental rights. In the petition, the Department stated,

The father's parenting deficiencies include lack of parenting skills, domestic violence, ongoing criminal activity, substance abuse issues, and lack of safe and stable housing. Services offered to the father have included a drug/alcohol evaluation and treatment, random [urinalysis] testing, parenting classes, a domestic violence evaluation and treatment, and casework management.

The Department also summarized Warner's pattern of failing to complete court-ordered services. It stated that, at the time, he was in custody after being arrested for possession of a stolen vehicle and identity theft. It stated that he had taken multiple urinalysis tests in 2016 that tested positive for drugs, including marijuana, methamphetamines, morphine, oxycodone, and oxymorphine. And, it noted that he had failed to visit U.D.W. on a regular basis, "partly due to incarceration and inpatient treatment." For these reasons, the Department concluded, "[T]he father does not understand and is incapable of providing for the child's emotional, physical, mental, and developmental needs. The father is incapable of safely parenting the child. He has not demonstrated the ability to care for his child."

Despite maintaining a generally positive relationship with U.D.W., there were reports of concerning behavior by Warner during visits. For example, on July 14, 2017, he had a visitation supervised by Lori Kirkland. During the visit, Kirkland had to intervene when Warner was feeding U.D.W. U.D.W. is a high medical risk child and eats and drinks in a very specific way to avoid issues. He has problems with swallowing and must have thickened liquids to avoid aspiration. At the

beginning of the visit, Warner was told that U.D.W. had to eat solid food first and then wait before drinking liquids. However, he tried to give U.D.W. a bottle in the middle of eating solid food. Kirkland immediately told Warner to get the bottle out of U.D.W.'s mouth. Warner told Kirkland that it "was his kid and to chill." Kirkland had to threaten to end the visit twice before he followed her instructions.

After the visit, the trial court conditioned Warner's visitation on complying with directions for proper feeding. It stated that the Department would provide instructions in writing. Marcia Hall, another visitation supervisor, had highly detailed instructions from U.D.W.'s foster mother on how to feed him. Hall conveyed this information to Warner. A copy of an August 2017 letter with feeding instructions from the Sherwood Learning Center was also kept in the traveling file for Warner's visits. Hall gave warner a copy of the letter and discussed it with him on multiple occasions.

At the December 2017 trial on the Department's petition, Warner testified that he was aware of U.D.W.'s medical issues. Specifically, he testified that U.D.W. was at risk of getting fluid in his lungs, had problems swallowing solid foods, and had a high risk of choking. U.D.W.'s special medical needs also include a sensitivity to smoke due to respiratory issues. Warner testified that he was aware of U.D.W.'s sensitivity to smoke, including marijuana.

Warner was in jail when the trial commenced. He was released after the first two days of trial. He testified that, after his release, he smoked marijuana with his brother.

The social worker assigned to the case testified that she did not believe Warner was fit to parent his son. She stated in part,

> [H]is drug and alcohol issues have not been properly addressed. Therefore, if he continues to use, which he reported that he used when he was released from jail, that could impact the development of [U.D.W.], and also -- and also limit his ability to act appropriately and follow through with [U.D.W.]'s special medical needs, or impair his ability, I should say.

She explained that U.D.W. "needs routine medical care that's going to be followed up on, and it can't be compromised by someone who is under the influence of any kind of mind-altering substance." She also stated that "if a parent is not available due to being incarcerated, that also leaves [U.D.W.] subject to being in the care of someone else who may not know all of [U.D.W.]'s special needs."

The trial court terminated Warner's parental rights. In its findings, the court identified Warner's problems with anger and violence as a deficiency he failed to correct that rendered him unfit to parent. It also found little likelihood that conditions would be remedied so that U.D.W. could be returned to Warner in the near future.

Warner appealed the order terminating his parental rights to this court. U.D.W., No. 77991-5-I, slip. op. at 5. He argued in part that he was denied due process because he was not notified during the dependency that his inability to control anger would be considered as a basis for terminating his parental rights. Id. at 6.

On appeal, the Department argued that notice was sufficient because it was evident that Warner's anger played a role in other parental deficiencies, such as

domestic violence and inability to care for his child. Id. at 7-8. But, this court found that there was nothing in the record to suggest that Warner was aware of an "inextricable connection that would allow notice of one issue to suffice for the other." Id. at 8. The Department also argued that, because of actions the Department took in response to problematic incidents, Warner knew that it was concerned about his behavior. Id. But, this court noted that "knowledge of evidentiary facts does not equate to knowledge of the parental deficiencies the Department will rely on." Id. It held that the trial court's reliance on Warner's anger issues was error and remanded the case back to the trial court. Id. at 9. It directed the court to "consider whether termination is appropriate on the basis of the parental deficiencies of which the father was properly notified." Id. at 9.

On remand, the trial court again terminated Warner's parental rights. It stated,

> Because of all of his issues, including frequent arrests and ongoing criminal activity, lack of compliance with and poor attendance at services such as parenting classes and drug and alcohol treatment, lack of safe, stable housing, his ongoing drug/alcohol addiction, unaddressed domestic violence problem, and an inability to maintain a stable living environment, the court finds the father is currently unfit to parent [U.D.W.].

The court also entered the following finding of fact:

> This child's special needs [are] important factor[s] in determining his best interests and termination of the father's parental rights. This child has health issues that require significant attention and care. The father has not shown an ability to provide for even the basic needs of a child, much less the additional care required by this child. Because of this, and each of the findings listed above, it is in the best interest of the child that the parental rights of [Warner] be terminated under RCW 13.34.180 and .190.

7

Warner appeals.

## DISCUSSION

Warner argues that he was not notified during the dependency that his inability to meet U.D.W.'s special needs would be considered as a basis for terminating his parental rights. As a result, he contends that the trial court violated his right to due process by basing its termination order in part on this deficiency.

Parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Parental rights cannot be abridged without due process of law. In re Dependency of A.M.M., 182 Wn. App. 776, 790-91, 332 P.3d 500 (2014). The due process protections afforded to parents in a termination hearing include notice and time to prepare and respond to charges. In re Dependency of H.W., 70 Wn. App. 552, 555 n.1, 854 P.2d 1100 (1993). Such notice is necessary "'to prevent surprise, helplessness, and disadvantage.'" A.M.M., 182 Wn. App. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)). Whether a proceeding satisfies due process is a question of law that we review de novo. In re Welfare of J.M., 130 Wn. App. 912, 920, 125 P.3d 245 (2005).

Warner relies on A.M.M. There, the trial court terminated Knopff's parental rights based in part on her lack of knowledge regarding her children's developmental needs. A.M.M., 182 Wn. App. at 792. It also cited her "significant substance abuse" and "unavailability and lack of follow through." Id. Knopff argued on appeal that she was not notified before trial that her lack of knowledge

8

regarding her children's developmental needs constituted a parental deficiency on which termination could be based. Id. at 791. Therefore, she contended that her due process right to adequate notice was violated. Id. at 790.

This court noted that neither the termination petition nor the dependency petition stated that Knopff's lack of knowledge regarding her children's developmental needs constituted a parental deficiency. Id. at 792. And, although the services the State provided to Knopff included age-appropriate parenting classes, there was no evidence that she was informed that she could lose her parental rights if she did not adequately familiarize herself with her children's developmental needs. Id. As a result, this court held that Knopff was not given adequate notice of this parental deficiency. Id. It reversed and remanded the case with instructions for the trial court to consider whether termination was appropriate based on the parental deficiencies of which Knopff had notice. Id. at 792-93.

The Department points out that in In re Parental Rights to F.M.O., 194 Wn. App. 226, 232, 374 P.3d 273 (2016), this court rejected the argument that only the parental deficiencies identified in the termination petition can serve as a basis for termination. The F.M.O. court noted that, in most instances, "termination is the endgame in lengthy proceedings where the parties have wrestled over the needed services during the previous years and there is no question what deficiencies are truly at issue." Id. It therefore found that "it serves only form instead of substance to rigidly require notice be provided in the termination petition itself." Id. However, F.M.O.'s mother was not notified until trial that her recurring incarceration was a parental deficiency she needed to defend against. Id. at 227, 232-33. Thus, this

court held that the trial court erred in including incarceration in the list of proven deficiencies. Id. at 227, 233.

Warner argues that, like A.M.M., neither the dependency petition nor the termination petition identified his inability to meet U.D.W.'s special needs as a parental deficiency. But, the termination petition stated that Warner's parental deficiencies included a lack of parenting skills. The petition went on to state that there was little likelihood that conditions would be remedied so that U.D.W. could be returned to Warner in the near future. In doing so, it concluded, "[T]he father does not understand and is incapable of providing for the child's emotional, physical, mental, and developmental needs. The father is incapable of safely parenting the child. He has not demonstrated the ability to care for his child." The reference to U.D.W.'s emotional, physical, mental, and developmental needs necessarily included any needs specific to U.D.W., such as those relating to his health issues.

Beyond the termination petition, multiple people, including visitation supervisors and a social worker with the Department, discussed U.D.W.'s health issues with Warner. In July 2016, Lopez reiterated to Warner the importance of not smoking or being around people that are smoking before seeing U.D.W. In July 2017, Kirkland informed Warner that U.D.W. had to eat solid food first and then wait before drinking liquids. Despite this instruction, Warner tried to give U.D.W. a bottle in the middle of eating solid food, and Kirkland had to intervene. The trial court then conditioned Warner's visitation on complying with directions for proper feeding. A letter with feeding instructions was kept in the traveling file for

Warner's visits. Hall discussed the letter with Warner multiple times. And, Warner testified at trial that he was aware of U.D.W.'s medical issues, including his problems with swallowing foods and sensitivity to smoke.

Warner also contends that he was "never ordered to engage in services designed to address parenting the child's special needs as part of the dependency, and he was never offered these by the Department as reunification services." But, as discussed above, the trial court conditioned Warner's visitation on complying with directions for proper feeding. It stated that the Department would provide these instructions in writing. A letter with feeding instructions was then kept in the traveling file for his visits, and a visitation supervisor recalled giving him a copy of the letter. She also discussed the letter with him multiple times. The Department also offered Warner parenting classes as part of the dependency. Warner was clearly on notice that his inability to care for U.D.W., including his inability to care for U.D.W.'s special needs, like proper feeding, was a parental deficiency at issue in the termination proceeding.

The trial court's finding that Warner had not shown an ability to provide for U.D.W.'s basic needs or the additional care he requires was not a reference to a new topic. Unlike F.M.O., he did not learn for the first time at trial that his inability to care for U.D.W.'s special needs was a parental deficiency he needed to defend against. Warner was aware of U.D.W.'s medical issues. The Department stated in the termination petition that Warner lacked parenting skills. It also stated that he was incapable of providing for U.D.W.'s emotional, physical, mental, and developmental needs. U.D.W.'s medical issues and feeding requirements were

discussed with Warner multiple times. The trial court even conditioned Warner's visits on his compliance with properly feeding U.D.W.

Warner had adequate notice that his inability to care for U.D.W.'s special needs was a parental deficiency at issue. Accordingly, he fails to establish a due process violation.

We affirm.

*Appelwick, CJ*

WE CONCUR:

_____

*Leach, J.*